Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

ANTONIO SUAREZ-PEREZ,     :
                   :
      Petitioner,        :     Civ. No. 21-15948 (RK)
                   :
    v.                 :
                   :     **OPINION**
RAYMOND ROYCE, et al.      :
                   :
      Respondents.      :

---

**ROBERT KIRSCH, U.S.D.J.**

Petitioner Antonio Suarez-Perez, a state prisoner appearing *pro se* in this habeas proceeding under 28 U.S.C. § 2254, challenges his conviction and sentence in New Jersey Superior Court, Monmouth County, for murder and related charges. (ECF No. 5.) Respondent filed an answer and brief in opposition to habeas relief. (ECF No. 14.) Petitioner Filed a reply brief. (ECF No. 15.) For the reasons explained in this Opinion, the Court denies the Amended Petition and also denies a certificate of appealability.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Antonio Suarez–Perez challenges his judgment of conviction for the first-degree murders of Sidney Wakefield and Joseph Fann and related offenses. *See State v. Suarez-Perez*, No. A-0384-12T1, 2015 WL 7729061, at *1 (N.J. Super. App. Div. Dec. 1, 2015). His co-defendants Eric Figueras and Samson Hearn testified against him at trial. *Id.* In its opinion denying Petitioner's direct appeal, the Appellate Division summarized the evidence introduced at trial:

> Figueras and Hearn testified as follows regarding events leading up
> to the murders on the night of February 10–11, 2009.

Figueras was planning to spend the evening with Hearn. Defendant arrived at Figueras's home, saying he wanted to join them. Defendant showed both Figueras and Hearn a black gun, which he said held ten bullets. Defendant then asked Hearn to drive him to an apartment complex where his brother lived on Locust Avenue in Red Bank.

Hearn drove defendant and Figueras in his dark blue Audi. At a parking lot outside the complex, defendant exited the car and again showed them the gun. The three men then bought and drank beer, and defendant talked with his brother and other relatives.

Next, Defendant asked Hearn to drive him to a housing development. On the way, however, defendant asked Hearn to slow down, and appeared to be looking for someone. He asked Hearn to drive to a nearby gas station, where Wakefield's white Lexus was parked.

At the gas station, Hearn saw defendant speaking with Wakefield and Fann. When defendant returned to Hearn's car, defendant seemed upset. Defendant, Hearn, and Figueras returned to the parking lot on Locust Avenue. As soon as Hearn parked the Audi, defendant got out, told them to wait, said he would be right back, and walked out of sight.

Shortly thereafter, at about 1:30 a.m., neighborhood residents heard multiple gunshots and went to their windows. One eyewitness saw a man, wearing dark clothes and a hood over his head, standing over and shooting a victim lying face down on the ground. The man then ran up to a white car, and there was another gunshot. A second eyewitness saw a hooded man standing in the street firing, and then run around the corner. A third eyewitness saw a hooded man wearing dark clothes running back down Locust Avenue. The eyewitnesses heard up to ten gunshots.

Defendant later told Figueras that he had been paid $30,000 to kill the two men. Defendant subsequently told a fellow prisoner that he alone had killed the two men. Defendant related that he approached the passenger side of the car and shot the passenger twice, then the driver once. Defendant added that when the driver got out of the car and tried to get away, defendant caught up with the driver and shot him again.

Minutes later, when the police arrived at the scene, they found Wakefield lying dead in the street, fatally shot three times in the back of the head. He had been shot a total of eight times. Bloodstains on the driver's door and street indicated he had been wounded in the white Lexus, gotten out, and fallen on the street, where he had been shot repeatedly.

2

The police found Fann dead in the front passenger seat of the white Lexus. He had been shot twice in the head from the right side. The first bullet resulted in extreme bleeding, causing Fann to choke on his own blood, and cough blood on the now-unoccupied driver's seat. The second bullet brought death instantly.

Both victims had been shot from four to five feet away. Both had cash and cocaine on their persons.

Figueras and Hearn further testified as follows. After the first few gunshots, defendant's brother called from his apartment window and asked if it was defendant. Hearn and Figueras testified that right after they heard the last gunshot, defendant came hurrying toward them, red in the face, out of breath, and looking over his shoulder. Defendant got back in the Audi, repeatedly saying "Let's go!" or "Go!" As Hearn drove, defendant showed Figueras he now had some crack cocaine.

As they drove away, Figueras heard defendant say, "damn, I just killed both of these mother [f]*ers." Defendant removed the clip from the gun and added, "damn, I emptied the clip on both of those mother f*ers," and that the gun was jammed.

Patrolman James DePonte quickly responded to reports of multiple gunshots at 1:35 a.m. As he drove the empty streets to the scene, he saw a dark blue or black Audi traveling in the opposite direction one block from the scene. DePonte shined his spotlight on the car, which contained three men. As the Audi drove past, the man in the back seat turned around and looked back.

Patrolman DePonte arrived at the scene, found the carnage, and left to pursue the Audi. After a pursuit at extreme speed, he discovered and stopped the Audi at an intersection. He and another officer found Hearn in the driver's seat, Figueras in the front passenger seat, and defendant in the rear seat. The officers arrested the three men. Defendant was wearing a dark hooded sweatshirt, a dark coat, dark sneakers, and blue jeans. In the Audi, the police discovered a ski mask which smelled of defendant's cologne and bore his DNA.

The police tested the three men's hands for gunshot residue. Only defendant's hands tested positive for gunshot residue. Subsequent testing found a very high number of gunshot residue particles on defendant's ski mask, hooded sweatshirt, coat, and jeans.

Right before the Audi had been stopped, Figueras had seen defendant stick his hand out of the open car window. Later that morning, a citizen found a 9 mm semi-automatic gun lying on the side of the road near where the Audi had been stopped. The now-empty gun had a capacity of ten bullets, and was designed to lock after all the bullets were fired. All of the ten shell casings, and the

> six testable bullets, recovered in or near the victims had been fired
> from that gun.

*Suarez-Perez*, 2015 WL 7729061, at \*1–2.

The grand jury indicted Petitioner and Figueras with the first-degree purposeful and knowing murder of Wakefield, and the first-degree purposeful and knowing murder of Fann, N.J.S.A. 2C:11–3(a)(1)–(2). *Id.* at \*2. Petitioner, Figueras, and Hearn were also charged with first-degree armed robbery of Wakefield and Fann, N.J.S.A. 2C:15–1, and with first-degree felony murder of Wakefield and Fann during an armed robbery, N.J.S.A. 2C:11–3(a)(3). *Id.* The indictment charged Petitioner, Figueras, and Hearn with second-degree possession of a firearm for unlawful purposes, N.J.S.A. 2C:39–4(a), and with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39–5(b). *Id.* Petitioner and Figueras were charged with fourth-degree tampering with physical evidence, N.J.S.A. 2C:28–6(1), and Figueras and Hearn were charged with obstruction and hindering Petitioner's apprehension. *Id.*

Prior to trial, Figueras and Hearn each pleaded guilty to hindering, and testified against Petitioner at trial, along with the eyewitnesses, police officers, and experts. *Id.* at \*3. Petitioner did not present any witnesses, and, after an eight-week trial, the jury convicted defendant of the murders of Wakefield and Fann, the firearm and handgun offenses, and tampering. *Id.* The jury acquitted Petitioner of armed robbery and did not reach the felony murder counts. *Id.*

The trial court sentenced Petitioner to consecutive terms of life in prison without parole for the murders of Wakefield and Fann. *Id.* The court merged the count charging possession of a firearm for an unlawful purpose into the murder counts. *Id.* The court also imposed a concurrent sentence of ten years' in prison, with five years of parole ineligibility, for unlawful possession of a firearm, and a concurrent sentence of eighteen months for tampering. *Id.*

Petitioner filed a notice of appeal (*see* ECF No. 14-31), and on December 1, 2015, the Appellate Division affirmed his conviction and sentence. *Suarez-Perez*, 2015 WL 7729061 at *10. On March 14, 2016, the Supreme Court of New Jersey denied his petition for certification. *State v. Suarez-Perez*, 224 N.J. 282 (2016).

On or about August 23, 2016, Petitioner filed a pro se petition for postconviction relief, and he filed an amended petition for postconviction relief on April 7, 2017, raising claims of ineffective assistance of counsel. (ECF Nos. 14-38, 14-39.) The PCR court held oral argument on June 22, 2018, and on June 26, 2018, the PCR court denied the petition without a hearing. (ECF Nos. 14-42, 14-43, 14-44.)

Petitioner appealed the denial of his PCR petition (ECF No. 14-45), and on April 9, 2021, the Appellate Division affirmed the PCR court's decision. *State v. Suarez-Perez*, No. 09-07-1405, 2021 WL 1327165, at *1 (N.J. Super. App. Div. Apr. 9, 2021). The Supreme Court of New Jersey denied his petition for certification on July 2, 2021. *State v. Suarez-Perez*, 247 N.J. 232 (2021).

Petitioner submitted his original federal habeas petition for filing on August 12, 2021 (ECF No. 1), and the District Court dismissed it without prejudice on September 14, 2021, but permitted him to correct the deficiencies in his original petition within 30 days. (ECF Nos. 3-4.) Petitioner submitted an Amended Petition on October 7, 2021. (ECF No. 5.)

On October 27, 2021, the District Court directed Respondents to answer the Amended Petition.[1] (ECF No. 7.) After receiving several extensions, Respondents filed their answer on June 14, 2022. (ECF No. 14.) Petitioner filed his reply brief on August 17, 2022. (ECF No. 15.) The matter was transferred to the undersigned on May 15, 2023. (ECF No. 16.)

---

[1] Petitioner also submitted an application for pro bono counsel, which the District Court denied without prejudice. (ECF Nos. 6-7.)

II.    **LEGAL STANDARD**

An application for writ of habeas corpus by a person challenging a state court judgment may only be granted based on violations of the Constitution or laws or treaties of the United States. *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254).  Under 28 U.S.C. § 2254(d), federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted).  A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411; *accord Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011).  Furthermore, a state court's factual findings are presumed correct, and a petitioner can rebut them only by clear and convincing evidence.  28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden

of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196

(3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

In determining whether a state court decision was based on an unreasonable determination

of the facts:

> federal court review considers only whether the state court
> adjudication "resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).
> The statute directs the federal court to presume that all
> determinations of fact made by the state court are correct and
> requires that the petitioner present "clear and convincing evidence"
> to rebut this presumption.

*Hunterson v. DiSabato*, 308 F.3d 236, 245–46 (3d Cir. 2002) (citing 28 U.S.C. § 2254(e)(1);

*Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 368 (3d Cir. 2002)).  This is a "difficult" test to

meet and is a "highly deferential standard for evaluating state-court rulings, which demands that

state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181

(2011).

The relevant state court decision for federal habeas corpus review is the last reasoned state

court decision.  *Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Bond v. Beard*, 539 F.3d 256, 289-90

(3d Cir. 2008).  Furthermore, "[w]here there has been one reasoned state judgment rejecting a

federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest

upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson*, 584 U.S.

at 125; *Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting

the applicability of Ylst's "look through" doctrine).  These deferential standards apply "even where

there has been a summary denial" by the state court.  *Cullen*, 563 U.S. at 187.

Finally, where a petitioner's constitutional claims are unexhausted and/or procedurally

defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2).  *See*

*Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## III.    DISCUSSION

The Amended Petition asserts four grounds for relief.  Grounds Two, Three, and Four assert claims Petitioner raised on direct appeal, and Ground One includes three subparts, which raise ineffective assistance of counsel claims that Petitioner asserted in his PCR proceedings.  (*See* Generally ECF No. 5, Amended Petition.)  The Court begins with the claims Petitioner raised on direct appeal followed by the claims he raised in his PCR petition.

### a.  Claims Related to the Codefendants' Testimony (Grounds Two & Three)

Petitioner claims in Grounds Two and Three that the prosecutor improperly elicited the following testimony from his codefendants: 1) that Petitioner threatened Hearn and Figueras for "snitching;" and 2) that each codefendant signed a memorandum of understanding ("MOU") as part of his plea agreement, which required him to tell the truth.  Petitioner further contends that the prosecutor's emphasis on the MOU's truthfulness requirement in the opening and closing statements constituted impermissible vouching.

The Appellate Division summarized the facts related to the threat testimony as follows:

> Most of defendant's claims arise from the testimony of Figueras and Hearn, particularly the events leading up to their testimony. Immediately after their arrest, Figueras and Hearn were separately interviewed by police officers three times. In the first round of interviews, both Figueras and Hearn related innocuous aspects of their travels with defendant that evening. Neither mentioned any gunshots.

In the second round of interviews, after the police revealed that Wakefield was dead, Figueras and Hearn were interviewed by Detective Jose Cruz. Figueras and Hearn now admitted hearing six to eight gunshots. They both said they had not mentioned the gunshots in the earlier interview because they were scared.

In the third round of interviews, Cruz confronted Figueras and Hearn with the information that the gun had been discovered and that the eyewitnesses had seen the shooter. Figueras and Hearn then revealed information incriminating defendant. Figueras and Hearn later testified to those facts at trial.

After their third round of interviews, Figueras and Hearn encountered each other and each revealed he had told the truth. Shortly thereafter, defendant separately encountered both Figueras and Hearn. Defendant told Figueras "you better not be snitching on me or I'm gonna kill you." Defendant similarly told Hearn "you guys are snitching," and threatened, "I got you." Defendant later angrily confronted Figueras about snitching on him, and said he would kill Figueras. Figueras told Hearn of defendant's threat. Defendant later made a threatening gesture to Hearn and Figueras.

Several months after being charged, Hearn offered to give a proffer statement, but was unable to proceed because he was afraid of retaliation. Hearn later revealed that defendant had approached him earlier that day and said that Figueras was snitching and that defendant was going to kill Figueras. Defendant also asked how Hearn's mother and grandmother were doing, which Hearn perceived as a threat.

Subsequently, both Hearn and Figueras gave proffer statements, and then pled guilty to second-degree hindering in return for a recommendation of a five-year prison sentence. As part of the plea deal, each man signed a memorandum of understanding with the prosecutor's office.

At trial, Figueras and Hearn both testified that they had lied and withheld information in their initial interviews because they were afraid of retaliation. Both testified that they had told the complete truth in their third interviews.

While in State prison, Figueras claimed to an inmate that he and defendant had gotten into the back seat of the Lexus, and each had killed one of the victims.[2] Figueras testified that he lied to the inmate

---

[2] "We note that Figueras weighed 355 pounds at the time of the murders, and there was eyewitness testimony that the shooter, like defendant, was 'pretty skinny.'" *Suarez-Perez*, 2015 WL 7729061, at *4.

because he was scared of the inmates and wanted to appear a "bad ass" so they would not mess with him.

*Suarez-Perez*, 2015 WL 7729061, at *3–4.

On direct appeal, Petitioner claimed that "it was improper for the prosecutor to elicit the testimony from Figueras and Hearn that the Defendant had threatened them for 'snitching.'" *See id.* at *7. The Appellate Division viewed this claim as a challenge to the admission of evidence and considered it under the plain error standard because Petitioner did not raise it below. *Id.*

The Appellate Division determined that the testimony about Petitioner's threats was properly admitted under state law and that its admission did not amount to plain error:

> "'Our courts have long held that evidence of threats made by a defendant to induce a witness not to testify is admissible because it illuminates the declarant's consciousness of guilt.'" *State v. Goodman*, 415 N.J. Super. 210, 232 (App. Div.2010) (citation omitted), certif. denied, 205 N.J. 78 (2011); *see, e.g., State v. Rechtschaffer*, 70 N.J. 395, 413–15 (1976). Moreover, "'we have long permitted admission of evidence of threats and coercion "to explain discrepancies or contradictions in a witness' testimony.'" *State v. Pierro*, 253 N.J. Super. 280, 286 (App. Div.) (citation omitted), certif. denied, 127 N.J. 564 (1992); *see, e.g., State v. DiRienzo*, 53 N.J. 360, 383 (1969).
>
> Defendant on appeal notes for the first time that the trial court did not issue a limiting instruction.[3] However, defendant is "in a poor position to argue on appeal about the failure of the trial judge to give a [limiting] instruction when he had not requested one[.]" *State v. Nelson*, 318 N.J.Super. 242, 254 (App.Div.), certif. denied, 158 N.J. 687 (1999).
>
> The court did instruct the jurors that, in determining the witnesses' credibility, they could consider the witnesses' "reasons why [their] prior statements or omissions were untrue," such as "self-protection

---

[3] "We have stated that evidence of threats to witnesses was "not subject to the restriction of [former] Evid. R. 55." *State v.. Johnson*, 216 N.J.Super. 588, 611 (App. Div.), certif. denied, 107 N.J. 647 (1987). However, such evidence is more properly viewed as "admissible to demonstrate consciousness of guilt under N.J.R.E. 404(b)." *State v. Yough*, 208 N.J. 385, 402 n. 9 (2011); *see, e.g., State v. Buhl*, 269 N.J. Super. 344, 364 (App. Div.), certif. denied, 135 N.J. 486 (1994). Evidence admitted under N.J.R.E. 404(b) should normally be accompanied by a limiting instruction. *State v. Cofield*, 127 N.J. 328, 340–41 (1992)." *Suarez-Perez*, 2015 WL 7729061, at *7.

> [and] fear." *See DiRienzo, supra*, 53 N.J. at 384. Moreover, the need
> for an instruction that "the jury 'should not draw any inference of
> consciousness of guilt by defendant from his post-crime conduct
> unless it believes that defendant acted to cover up a crime'" was
> lessened by the explicitness of defendant's threats against Figueras
> and Hearn for "snitching." *State v. Burden*, 393 N.J.Super. 159, 171
> (App. Div. 2007) (quoting *State v. Williams*, 190 N.J. 114, 134
> (2007)), certif. denied, 196 N.J. 344 (2008).
>
> Given the strong evidence against defendant, "we are not prepared
> to view this error as plain," *State v. Johnson*, 287 N.J. Super. 247,
> 262 (App. Div.), certif. denied, 147 N.J. 587 (1996), particularly as
> "the prosecutor did not suggest to the jury, in summation or
> otherwise, that they should use the evidence to draw . . . an improper
> conclusion." *Burden*, *supra*, 393 N.J. Super. at 172.

*Suarez-Perez*, 2015 WL 7729061, at *7.

Here, the Appellate Division did not violate clearly established federal law in rejecting Petitioner's claim that the prosecutor improperly elicited the threat evidence and that there was no plain error in admitting that evidence.  To the extent Petitioner argues that the admission of the threat evidence violated state law, such error is not a basis for habeas relief.  Indeed, Courts "may not consider on habeas review [a petitioner's] objection to the admissibility of the evidence because it presents a question of state law.  *See Collins v. Warden James T. Vaughn Correctional Center*, 2024 WL 4357221, at *4 n.1 (3d. Cir. Oct. 1, 2024) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding habeas review only looks to whether "the admission of the evidence violated [defendant]'s constitutional rights" and not state law questions); *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (holding the Due Process Clause is not a mechanism through which a federal habeas court may engage in a "review of the wisdom of state evidentiary rules")).  A habeas petitioner may raise a habeas claim based on a state law evidentiary ruling only where he can show that the admission of the evidence at issue denied him due process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial."

*Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)).

And even if the challenge to the threat testimony were cognizable as a federal claim, it would fail because a defendant's attempts to threaten or intimidate a witness may be introduced in federal court without running afoul of Rule 404(b) to show consciousness of guilt. *See United States v. Gatto*, 995 F.2d 449, 454 (3d Cir. 1993) ("It is well-established that evidence of threats or intimidation is admissible under Rule 404(b) to show a defendant's consciousness of guilt . . . ."); *see also United States v. Hayden*, 85 F.3d 153, 159 (4th Cir. 1996) ("Evidence of witness intimidation is admissible to prove consciousness of guilt and criminal intent under Rule 404(b), if the evidence (1) is related to the offense charged and (2) is reliable."); *United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) ("Though not listed in Rule 404(b), spoliation evidence, including evidence that defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt.").

For these reasons, the Court denies habeas relief on this claim.

In Petitioner's second ground for relief, he claims that the prosecutor engaged in misconduct by repeatedly emphasizing the MOU's requirement to testify truthfully, thereby bolstering the key witnesses for the state. He also contends that the state court erred in admitting this evidence.

At trial, before questioning co-defendants Hearn and Figueras about the events of February 9 and 10, 2009, the prosecutor asked each about their respective plea agreements. Both co-defendants acknowledged signing an MOU in which they agreed (1) to "cooperate fully" in the investigation, including disclosing "information concerning the activities of [Samson Hearn, Eric Figueras,] Antonio Suarez-Perez and any other individuals which resulted in the deaths of Sidney

Wakefield and Joseph Fann;" (2) to allow unrestricted interviews by prosecuting officials; and, (3) to "testify truthfully when called as a witness" in any court proceeding concerning the deaths of the victims. (*See* ECF No. 14-15, Trial Tr. at 57:4-58:7; ECF No. 14-17, Trial Tr. at 10:23-11:23.) Each MOU cautioned that, if the codefendant testified falsely, the agreement would be null and void and the codefendant would be prosecuted for perjury and false swearing in addition to the more serious crimes charged in the indictment. (ECF No. 14-15, Trial Tr. 58:10-16; ECF No. 14-17, Trial Tr. at 11:24-12:5.)

Further, according to the MOU, if the prosecutor's office believed the codefendant breached any condition of the agreement, "the State shall present the alleged breach to a judge of the Superior Court who will determine whether the breach exists." (ECF No. 14-15, Trial Tr. at 58:10-59:12; ECF No. 14-17, Trial Tr. at 11:24-12:25.) The prosecutor asked each codefendant, "So in other words, while the State can inform the Court of a breach, it's the Court's decision of whether ultimately you lose your pl[ea] in this case if you breach this and you lie under oath." (ECF No. 14-15, Trial Tr. at 59:8-11; ECF No. 14-17, Trial Tr. at 12:12-18.) Figueras answered, "Correct," (ECF No. 14-15, Trial Tr. at 59:12), as did Hearn. (ECF No. 14-17, Trial Tr. at 12:19-25.) The MOUs were not moved into evidence. (*See* ECF No. 14-23, Trial Tr. at 17:8-18:1.)

Petitioner did not object to any of this testimony, and trial counsel cross-examined both Figueras and Hearn about their agreements with the State. Petitioner's counsel asked: "What was your understanding of a proffer session?" Figueras testified as follows: "If I give my statement and tell the truth and the whole truth, that I would have a deal." (ECF No. 14-15, Trial Tr. at 24:5-10.) On cross-examination, Hearn similarly testified that it was his understanding that if his testimony and cooperation were found to be truthful, the State would amend the charges against

him to third-degree hindering and he would get a probationary sentence without any jail time. (ECF No. 14-18, Trial Tr. at 46:17-20, 47:11-22.)

The prosecutor's opening statement referred briefly to the truthfulness requirement in the MOUs signed by Figueras and Hearn. (*See* ECF No. 14-5, Trial Tr. at 40:1-41:22.) In response to trial counsel's arguments in summation, the prosecutor stated in his closing statement that the MOU instructed witnesses "to tell the truth against whomever was involved" and also stated that the agreement sought "to get to the truth, no matter where it takes us." (*See* ECF No. 14-24, Trial Tr. at 69:10-70:20.)

Petitioner argued on appeal that the prosecutor engaged in misconduct when he elicited this testimony from Figueras and Hearn and that their testimony was improperly admitted. The Appellate Division summarized the challenged MOU testimony and found that that it was properly admitted under state law:

> In response to the prosecutor's questions quoting the memorandum, Figueras testified that his memorandum required him to "cooperate fully with" the investigation, to disclose "all relevant information," and to "testify truthfully when called as a witness in any grand jury, pretrial and/or petit jury proceedings . . . which concerns the events which resulted in the deaths of Sidney Wakefield and Joseph Fann." Figueras also agreed the memorandum stated that if he "testifies falsely under oath, this agreement is null and void and [he] will be prosecuted for perjury and/or false swearing." Figueras further agreed the memorandum provided that if the prosecutor's office believed Figueras had breached the agreement, "the State shall present the alleged breach to a judge of the Superior Court who will determine whether that breach exists," and that if the judge found a material breach "the agreement shall be declared null and void." Hearn gave similar testimony, and agreed that if the agreement was null and void, the original charges would be reinstated and he could be prosecuted.
>
> Defendant did not object to any of that testimony at trial. On appeal, however, defendant first claims it was prosecutorial misconduct to elicit that testimony from Figueras and Hearn. "This is more properly viewed as a challenge to the trial court's admission of evidence." *State v. Patterson*, 435 N.J.Super. 498, 507 (App. Div.

2014). "'[C]onsiderable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion.'" *State v. Kuropchak*, 221 N.J. 368, 385 (2015) (citation omitted). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted." *Ibid.* (internal quotation marks omitted). Moreover, "if the party appealing did not make its objection to admission known to the trial court, the reviewing court will review for plain error, only reversing if the error is 'clearly capable of producing an unjust result.'" *State v. Rose*, 206 N.J. 141, 157 (2011) (quoting R. 2:10–2). We must hew to that standard of review.

The trial court did not commit plain error in admitting that testimony. "[W]here one of the considerations for a plea is an agreement by a co-defendant to testify truthfully for the State against another defendant in return for a recommendation of leniency, such promise or understanding should be fully, fairly and honestly disclosed when it comes into question at the trial." *State v. Nelson*, 330 N.J. Super. 206, 216 (App. Div. 2000) (citing *State v. Taylor*, 49 N.J. 440, 456 (1967)). The terms of the memorandum were relevant to the interest of Figueras and Hearn in testifying at trial. The memorandum's condition of truthful testimony is a common and appropriate requirement of cooperating plea agreements. *See, e.g., State v. Acevedo*, 205 N.J. 40, 42 (2011).

*Suarez-Perez*, 2015 WL 7729061, at *4–5.

The Appellate Division next held that the prosecutor did not engage in misconduct by referring to the MOU's truthfulness requirement in his opening and closing statements, citing to both state and federal precedent:

Second, defendant now claims that the prosecutor improperly emphasized the memorandum's requirement to testify truthfully in his opening and closing statement. "Prosecutors 'are afforded considerable leeway in making opening statements and summations.'" *State v. Echols*, 199 N.J. 344, 359–60 (2009) (citation omitted). "'[T]o justify reversal, the prosecutor's conduct must have been "clearly and unmistakably improper,"' and '"so egregious as to deprive defendant of a fair trial."'" *State v. Wakefield*, 190 N.J. 397, 438 (2007) (citation omitted), cert. denied, 552 U.S. 1146, 128 S.Ct. 1074, 169 L. Ed.2d 817 (2008). Moreover, defendant did not object to these references at trial. Thus, he "must demonstrate plain error to prevail." *State v. Timmendequas*, 161 N.J. 515, 576 (1999), cert. denied, 534 U.S. 858, 122 S. Ct. 136, 151 L.

Ed.2d 89 (2001). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." *Id.* at 576.

A prosecutor in his opening statement may state "those facts that [] he intends to prove in good faith[,]" and "also may argue all inferences that properly may be drawn from those facts." *Id.* at 577. Here, the prosecutor's opening made only brief mention of the memorandum which accurately related the subsequent testimony. The only mention of truthfulness was the accurate statement that if Hearn did not testify truthfully, that could be brought before the court who would then determine if there was a breach, which could void his plea deal.[4] Moreover, the prosecutor made clear that the memorandum was "not an agreement for [Hearn] to testify against the defendant," but against "any individual involved in the murder," including Figueras. These remarks were not plain error.

In his closing argument, the prosecutor referenced the memorandum primarily in response to defense counsel's closing argument. During closing, defense counsel had argued the memorandum provided that "[i]f you testify consistently with your proffer, then you will get your deal." The prosecutor responded that "[n]othing in the Memorandum of Understanding, not once, not ever, does it say you have to testify as to what your proffer statement says." The prosecutor argued that the memorandum instructed the witnesses to "tell the truth against whomever was involved." He added that the agreement sought "to get to the truth, no matter where it takes us." The prosecutor's argument did not misstate the memorandum or misuse its condition of truthful testimony. "'A prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial.'" *Patterson, supra,* 435 N.J.Super. at 510–11 (citation omitted).

Defendant claims the prosecutor was vouching. However, in eliciting the testimony about the memorandum, and referencing it in his opening and closing, "[t]he prosecutor did not vouch for the State's witnesses, [that is,] offer a personal opinion of defendant's veracity, or refer, explicitly or implicitly, to matters outside of the record." *State v. Morton,* 155 N.J. 383, 458 (1998), cert. denied, 532 U.S. 931, 121 S.Ct. 1380, 149 L. Ed.2d 306 (2001).

Defendant cites *United States v. Smith,* 962 F.2d 923 (9th Cir.1992), but there the government argued "that the witness could not say

---

[4] "This correctly summarized the memorandum, unlike defendant's counsel's opening, which asserted that '[i]t is up to the Prosecutor's Office to decide whether or not their testimony has been truthful enough to get their deal.'" *Suarez-Perez,* 2015 WL 7729061 at *6.

'whatever he wanted to say' because he would be prosecuted for perjury, and that 'the court wouldn't allow' the government to do anything wrong in the trial." *United States v. Johnson*, 437 F.3d 665, 672 (7th Cir.2006) (quoting *Smith, supra*, 962 F.2d at 933–34), cert. denied, 547 U.S. 1207, 126 S.Ct. 2902, 165 L. Ed.2d 919 (2006). By contrast, it is not vouching for "the government [to] elicit testimony regarding the witness's guilty plea or immunity deal [.]" *Id.* at 671–72. "By calling a witness who testifies pursuant to an agreement requiring him to testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having expressed his personal opinion on a witness' veracity." *United States v. Creamer*, 555 F.2d 612, 617–18 (7th Cir.), *cert. denied*, 434 U.S. 833, 98 S.Ct. 118, 54 L. Ed.2d 93 (1977).[5] Thus, defendant has not carried his "'burden of proving that [any] error was clear and obvious and that it affected his substantial rights.'" *State v. Koskovich*, 168 N.J. 448, 529 (2001) (citation omitted).

*Suarez-Perez*, 2015 WL 7729061, at *5-6.

Here, the Appellate Division did not unreasonably apply clearly established federal law or unreasonably determine the facts in light of the evidence in rejecting Petitioner's arguments that the MOU evidence was improperly admitted or that the prosecutor was vouching.[6]

Petitioner did not raise a federal due process challenge to the admission of the MOU testimony, but, even if he had, the state court properly determined that the admission of the

---

[5] "Indeed, in the federal courts "'[i]t is well established that prosecutors may admit plea agreements, even those which include truthfulness provisions, without violating the dictates against vouching.'" *United States v. Sigillito*, 759 F.3d 913, 932 (8th Cir. 2014) (quoting *United States v. Jones*, 468 F.3d 704, 707 (10th Cir. 2006)), cert. denied, —— U.S. ——, 135 S. Ct. 1019, 190 L. Ed.2d 887 (2015); *see, e.g., United States v. Milan*, 304 F.3d 273, 290 (3d Cir.2002), cert. denied, 538 U.S. 1024, 123 S. Ct. 1956, 155 L. Ed.2d 869 (2003); *see also United States v. Ortiz*, 362 F.3d 1274, 1278 (9th Cir. 2004) ("We see no plain error in simply eliciting on direct examination a witness's obligation through a plea agreement to tell the truth.")." *Suarez-Perez*, 2015 WL 7729061, at *6.

[6] The Court separately considers Petitioner's claim that his attorney was ineffective for failing to object to the admission of the MOU, the testimony about the MOU, and the prosecutor's vouching.

testimony about the MOU, including the truthfulness component, comported with state and federal law.  As such, Petitioner is not entitled to habeas relief on his claim that the MOU testimony was improperly admitted.

Petitioner also raises a prosecutorial misconduct claim regarding the prosecutor's comments about the MOU in his opening and closing statements.  The Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," *United States v. Young*, 470 U.S. 1, 11 (1985), but only when those comments can be said to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  "If the argument was improper, we determine whether it justifies relief by 'examin[ing] the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.'" *United States v. Savage*, 970 F.3d 217, 291 (3d Cir. 2020) (quoting *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)) (alteration in original).

Petitioner complains about a subset of prosecutorial misconduct known as bolstering or vouching.  "Prosecutors vouch when they (or their witnesses) assure the jury that a witness is credible." *Zeledjieski v. Superintendent Greene SCI*, 833 F. App'x. 950, 955 (3d Cir. 2020).  "Vouching can imply that the prosecution knows of "evidence not presented to the jury . . .  and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.* (citing *United States v. Young*, 470 U.S. 1, 18–19 (1985).  It also risks leading the

jury to trust the Government's view of the evidence presented rather than its own. *Id.* Improper "vouching" occurs where a prosecutor suggests that she has reasons to believe a witness that were not presented to the jury. *U.S. v. Rivas*, 493 F.3d 131, 137 (3d Cir. 2007) (citing *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006)); *see also United States v. Dispoz–O–Plastics, Inc.*, 172 F.3d 275, 283 (3d Cir.1999). A prosecutor may, however, urge that a witness is trustworthy by arguing from record evidence; vouching occurs only where the prosecutor implicitly refers to information outside the record. *Id.* (citing *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998)).

Here, the Appellate Division did not unreasonably apply clearly established federal law or unreasonably determine the facts in rejecting Petitioner's vouching claim. The record shows that the prosecutor did not offer a personal opinion of the witnesses' veracity, or refer, explicitly or implicitly, to matters outside of the record. As the Appellate Division found, eliciting testimony about the terms of the witnesses' plea deal, including the condition that they must testify truthfully, does not, without more, amount to vouching. As such, Petitioner cannot meet the high standard for relief on his prosecutorial misconduct claim, and the Court denies relief on this claim.

### b. Challenge to the Testimony of Detective Cruz (Ground Four)

Petitioner also contends that he was denied his right to a fair trial when Detective Cruz testified that he believed Hearn and Figueras gave truthful testimony. Petitioner raised this issue on direct appeal, arguing that Cruz' testimony exacerbated the prejudice from the prosecutor's vouching. The Appellate Division rejected this claim as follows:

> Defendant now complains of certain testimony by the lead detective, Detective Cruz, concerning his investigation regarding Figueras and Hearn. Again, defendant did not object to this testimony below. Indeed, defendant's counsel, whose strategy included arguing that the police had rushed to judgment in accusing defendant, stated that

19

she understood she opened the door to that testimony by her cross-examination of Cruz.

Defense counsel asked Detective Cruz if he believed Hearn's third statement was truthful. Counsel then suggested Cruz had not considered subsequent information, including that: Hearn had previously testified as a witness in a murder trial; delayed testing showed a small amount of gunshot residue on the clothes of Hearn and Figueras; and Figueras had told the inmate he had killed the victims with defendant. Counsel queried Cruz that after he received the statements from Hearn and Figueras in the third round of interviews, he was "pretty much done with [his] investigation as to who the shooter was," that he had "rush[ed] to pick a shooter," and that after the guilty pleas by Hearn and Figueras it was "too late to do anything about that."

The trial court ruled that defendant had opened the door for Detective Cruz to explain why he proceeded as he did in the investigation. On redirect, Cruz testified that if the subsequent information had caused him to suspect Hearn or Figueras, he could have notified the prosecutor who could have moved to rescind the plea deal under the memorandum. Cruz testified that he did not do so because Hearn's testimony in the prior murder trial appeared to be true; because some gunshot residue could have been transferred from defendant to the other occupants of the Audi, especially with wind coming in the open car window;[7] and because Figueras's claim to the inmate was a lie because it did not fit the evidence of how the shooting occurred, which he had also briefly testified to on direct. Cruz testified that he therefore conducted the investigation with the belief that the third statements of Hearn and Figueras had been truthful.

Normally, police officers are restricted to testifying that they acted "'upon information received,'" *State v. Kemp*, 195 N.J. 136, 154 (2008) (quoting *State v. Bankston*, 63 N.J. 263, 268 (1973)), and they may not opine on the credibility of other witnesses, *State v. Frisby*, 174 N.J. 583, 591–92 (2002). However, under "the invited error doctrine," the trial court did not abuse its discretion when it allowed Detective Cruz "to testify as to information he received in the course of his investigation that led him to focus on defendant as a suspect." *Kemp, supra*, 195 N.J. at 153–56. Where a defendant "opens the door by flagrantly and falsely suggesting that a police officer acted arbitrarily or with ill motive," "the officer might be permitted to dispel that false impression, despite the invited

---

[7] "The State's gunshot residue expert had already so testified. The tester also testified, so the jury was able to assess his credibility directly." *Suarez-Perez*, 2015 WL 7729061, at *8.

prejudice the defendant would suffer." *State v. Branch*, 182 N.J. 338, 352 (2005).

In any event, the trial court minimized any prejudice by careful and repeated instructions. Before the challenged testimony, the court instructed the jury that Cruz's testimony about information he received was not being offered for its truth but for the limited purpose of determining the credibility of his testimony about why he took certain investigatory steps. The court repeatedly reminded the jury that Cruz's conversations and conclusions were being admitted only for that limited purpose, and that the jury could not consider them for their truth or as substantive evidence. The court found the jury understood its limiting instructions, which the court reinforced in its final instructions. The court also instructed that the jury was the sole judge of credibility. We presume "jurors will follow the instructions given them by the court." *State v. T.J.M.*, 220 N.J. 220, 237 (2015).

Moreover, independent of the testimony of Hearn and Figueras, the State submitted powerful evidence of defendant's guilt, including eyewitness testimony, expert testimony, and defendant's own admissions of guilt. Given the strength of that evidence, and of the court's instructions, this testimony by Cruz did not have "a clear capacity to have affected the outcome of trial." *State v. Johnson*, 325 N.J. Super. 78, 88 (App. Div.1999), aff'd as modified, 166 N.J. 523 (2001); *see also Kemp, supra*, 195 N.J. at 156 (finding such testimony harmless).

*Suarez-Perez*, 2015 WL 7729061, at *7–9.

Respondents argue that the invited error doctrine is an adequate and independent state law ground for denying this claim on habeas review, citing several federal decisions. *See, e.g.*, *Druery v. Thaler*, 647 F.3d 535, 545 (5th Cir. 2011) (collecting cases); *Fields v. Bagley*, 275 F.3d 478, 486 (6th Cir. 2001) ("When a Petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error."); *see also Parker v. Champion*, 148 F.3d 1219, 1221–22 (10th Cir. 1998) (noting that habeas relief on the basis of an invited error is precluded); *Wilson v. Lindler*, 8 F.3d 173, 175 (4th Cir. 1993) (en banc) ("Even if we were to find such error in the trial of this case in the state court, the error was invited and therefore cannot form the basis for habeas corpus relief."). Indeed, a federal habeas court will not review a claim rejected by a state

court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Under New Jersey law, the doctrine of invited error "is designed to prevent defendants from manipulating the system." *State v. Jenkins*, 178 N.J. 347, 359 (N.J. 2004). It is "is implicated only when a defendant in some way has led the court into error." *Jenkins*, 178 N.J. at 359. Where it applies, the doctrine bars a defendant from raising an issue on appeal unless the error affected his substantive rights or the failure to consider the claim amounts to a fundamental miscarriage of justice. *See State v. A.R.*, 213 N.J. 542, 562 (N.J. 2013) (citations omitted). The Third Circuit has also held that a defendant "cannot complain on appeal of alleged errors invited or induced by himself." *United States v. Maury*, 695 F.3d 227, 256 (3d Cir. 2012) (quoting *United States v. Console*, 13 F.3d 641, 660 (3d Cir. 1993)). This is true because under the invited error doctrine, "when a litigant takes an unequivocal position at trial, he cannot on appeal assume a contrary position simply because the decision in retrospect was a tactical mistake, or perhaps a candid but regretted concession." *Lesende v. Borrero*, 752 F.3d 324, 337 (3d Cir. 2014) (internal quotation marks omitted).

Here, Ground Four appears to be procedurally barred based on invited error, and Petitioner has not argued that he can show cause or actual prejudice to overcome that procedural bar. Even if the claim were not procedurally barred, however, Petitioner would not be entitled to habeas relief unless he could show that the error in admitting Cruz's testimony "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638; *see also Freeman v. Superintendent Fayette SCI*, 62 F.4th 789, 802 (3d Cir. 2023). Petitioner is unable to make that showing in light of the state court's repeated instructions to the jury about the limited purpose of

Cruz' testimony and the overall strength of the evidence against Petitioner. For these reasons, the Court denies habeas relief on this claim.

### c. Ineffective Assistance of Counsel (Ground One)

In Ground One, Petitioner asserts ineffective assistance of trial counsel for A) failing to object to the prosecutor's vouching and for bolstering the co-defendants' testimony B) failing to call a potential witness, Lawrence McLendon to testify for the defense, and C) failing to file a pretrial motion to bar admission of the plea bargain.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *Id. at* 687. To establish an ineffective assistance of counsel claim, a petitioner must first prove "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In analyzing counsel's performance, the court must be "highly deferential." *Id.* at 689. The Supreme Court explained:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Id.* (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A convicted defendant asserting ineffective assistance must therefore identify the acts or omissions that are alleged not to have been the result of reasoned professional judgment. *Strickland*, 466 U.S. at 690.  The reviewing court then must determine whether, in light of all the circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance." *Id.*  It follows that counsel cannot be ineffective for declining to raise a meritless issue.  *Premo v. Moore*, 562 U.S. 115, 124 (2011).

The second part of the *Strickland* test requires a petitioner to demonstrate that counsel's performance "prejudiced the defense" by depriving petitioner of "a fair trial, a trial whose result is reliable." 466 U.S. at 687. To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Id.* at 694.

If a petitioner fails to satisfy either prong of the *Strickland* test, it is unnecessary to evaluate the other prong, as a petitioner must prove both prongs to establish an ineffectiveness claim. *Id.* at 697. Moreover, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

Because Petitioner's ineffective assistance of counsel claim is raised through a § 2254 petition, federal "review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'"  *See Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)); *see also Cullen*, 563 U.S. at 190 ("[R]eview of the [State] Supreme Court's decision is thus doubly deferential."); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[D]oubly deferential judicial review applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard . . . ."); *Yarborough v. Genrty*, 541 U.S. at 1, 6 (2003) ("Judicial

review of a defense attorney . . . is therefore highly deferential--and doubly deferential when it is conducted through the lens of federal habeas."). Indeed, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

**1. Failure to Object to the Prosecutor's Vouching and the Admission of the MOUs (Ground One, Subpoints A, C)**

In his PCR petition, Petitioner argued that trial counsel was ineffective for failure to object to the assistant prosecutor's "continued bolstering or vouching" for the co-defendant's credibility (subpoint A) and for failure to object to the admission at trial of the plea agreements (subpoint C). (*See* ECF No. 14-39 at ¶6; ECF No. 14-40 at 15.)

The PCR court rejected Petitioner's claims that his trial counsel was ineffective for failing to object to the admission of the plea agreements and the prosecutor's references to the MOU that amounted to vouching. It noted that the Appellate Division already held on direct appeal that the MOUs were admissible evidence relevant to the interests the codefendants' testimony at trial and that the prosecutor's references to the MOU in his opening and closing statements were appropriate and that he did not engage in vouching. (*See* ECF No. 14-43, PCR Decision at 14.) For that reason, the PCR court found that Petitioner had not established that his counsel was deficient under *Strickland's* first prong, and he could not make out a prima facie case of ineffective assistance. (*See id.* at 16.)

On appeal, the Appellate Division agreed and summarized the PCR court's rejection of this ineffective assistance claim as follows:

> Defendant first argued that trial counsel failed to object to the State bolstering or vouching for Hearns and Figueras, the co-defendants who testified against the defendant as part of their plea agreement. Defendant also argued trial counsel didn't object to the State's

25

mention during openings and summations of co-defendants' plea agreement. The PCR judge noted we disposed of the same arguments on appeal by concluding Hearns' and Figueras's written plea agreements were admissible as relevant to their interests in testifying at trial. Suarez-Perez, slip op. at 13. He further noted we held on direct appeal it was permissible for the State to reference contents of the plea agreements in the State's openings and closings, where it did so accurately and in a manner faithful to their respective contents. Suarez-Perez, slip op. at 15-16. The PCR judge found no ineffective assistance of counsel where we held the plea agreements admissible, and the State's references to the agreements not bolstering.

*State v. Suarez-Perez*, 2021 WL 1327165, at *3 (N.J. Super. App. Div. Apr. 9, 2021). The Appellate Division agreed and found that "the PCR judge properly rejected" the bolstering claims, which had been "resolved on direct appeal and could not serve as a basis for a subsequent PCR application." *Suarez-Perez*, 2021 WL 1327165, at *4.

The Appellate Division did not unreasonably apply *Strickland* in rejecting Petitioner's reframed bolstering claim. On direct appeal, the Appellate Division properly found that the prosecutor did not engage in impermissible vouching when he referenced the MOU's truthfulness requirements in his opening and closing statements, and that testimony about the MOUs was admissible under state and federal law. When the substantive issues underlying a claim of ineffective assistance of counsel are meritless, trial counsel is not ineffective for failing to object. *Thomas v. Horn*, 570 F.3d 105, 121 n.7 (3d Cir. 2009), cert. denied, 559 U.S. 1025 (2010); *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001). That is the case here, and the Court denies relief on this claim.

### 2.  Failure to Call Lawrence McLendon as a Witness (Ground 1, Subpoint B)

Petitioner also claimed in his PCR petition that trial counsel was ineffective for failing to call Lawrence McLendon as a witness on Defendants' behalf. (*See* ECF No. 40-14, PCR Petition at 26-33; ECF No. 14-42, PCR Tr. at 14:18-22:6.)

26

On May 20, 2009, Lawrence McLendon gave a signed statement to Detective Jose Cruz of the Monmouth County Prosecutor's Office regarding the circumstances surrounding an alleged conversation McLendon had with Eric Figueras on May 9, 2009, while the two were in the same holding cell at New Jersey State Prison.  (*See* ECF No. 14-1, McLendon Statement.)  McLendon told Detective Cruz in relevant part:

> [O]ut of nowhere, Eric [Figueras] informed me that he had pending charges and that his charges were felony murder. . . felony robbery. . . conspiracy to commit those crimes. . . and he said he had some weapons charges. . .he informed me he had two counts each on these charges. . . he told me that on the night this occurred, he was in a car with two other occupants. . . he said that he didn't want to give up any names, so I asked him so I would know who he was talking about, to just give me the ages. . . so he told me the driver and owner of the car was twenty-eight years old. . . the backseat passenger was twenty-one years old. . . and he was in the front passenger seat. . . he said they were driving around drinking and getting high on drugs. . . and they wanted to get more money, he said that he knew how they could get the drugs and money in one shot. . . he said that he had. . . he had a gun. . . and he said he knew some drug dealers they could rob. . . he said he told twenty-eight to drive to the spot where these guys hung out. . . he told the two of them that once they got there that him and twenty- one were going to rob the drug dealers. . . he told me that it was no problem for him to set this up because he grew up with these guys. . . he went to school with them and they know him really well. . . he said when they arrived he saw the two. . . the two drug dealers. . . they were both African-American males. . . he told me they were all around the same age. . . early or mid-twenties. . . they rolled up. . . twenty-one and Eric got out of the car. . . they approached the drug dealers. . . they talked about copping some coke. . . Eric had told twenty-eight to keep the car running before they got out. . . they walked a short distance to one of the black guys. . . drug dealer's car. . . the two drug dealers got in the front seat of the car. . . Eric and twenty-one. . . they got in the back seat of the car. . . when one of the drug dealers pulled out his drugs, Eric told him that they were beat and he was taking their shit. . . drug dealer began arguing. . . Eric went to grab the drugs. . . he said he pulled his weapon. . . he said that he was only trying to scare the guy but he wouldn't give up the drugs, so he popped him point blank. . . during that struggle, the other black guy who was in the front seat, he jumped out of the car. . . Eric said he was too big to chase this guy down. . . so he gave the gun to twenty-one. . . and told him to

27

> get him. . . he said while he was going through the black guy that he
> shot. . . his pockets. . . he heard a gunshot. . . and he figured that
> twenty [one] had caught up with the other drug dealer.

(ECF No. 14-1, McLendon Statement at 2-3) (ellipses in original).)

Petitioner's trial counsel used McLendon's statement to cross-examine co-defendant Eric Figueras and Detective Cruz but did not call McLendon as a witness for the defense. Petitioner argued that trial counsel's failure to call McClendon as a defense witness amounted to ineffective assistance: "Had McClendon testified[,] defendant may have escaped complicity as to one of the shootings given that Figueras fired one gun. This in turn would have allowed evidence to be introduced under [N.J. Rules of Evidence] 402 indicating third party guilt." (ECF No. 14-40, Petitioner's PCR Brief at 32-33.)

The PCR court rejected petitioner's claim, finding that trial counsel's decision not to call McClendon as a defense witness was a matter of trial strategy and that Petitioner had not shown prejudice:

> By way of background, Mr. McLendon was an inmate who was
> located in the same State prison facility, Central Reception and
> Assignment Facility ("CRAF"), as co-defendant Figueras during a
> period of time in 2009. Mr. McLendon provided a statement to the
> Monmouth County Prosecutor's Office in which he alleged that he
> had met co-defendant Figueras while they were both in CRAF, and
> that co-defendant Figueras confessed to murdering one of the
> victims. Mr. Figueras allegedly also told Mr. McLendon a
> completely different version of events than the version he testified
> to at trial. Trial counsel was provided with Mr. McLendon's
> statement and initially intended to call him as a witness at trial.
> (27T:65-1 to 65-2).
>
> As part of discovery, trial counsel was also provided with a copy of
> Mr. McLendon's criminal record, which included numerous prior
> state and federal convictions for sexual assault and robbery, as well
> as with letters that Mr. McClendon had sent to the Prosecutor's
> Office requesting a reduction in his sentence for the information he
> provided about co-defendant Figueras. Trial counsel also received a
> copy of the letter that the Monmouth County Prosecutor's Office
> sent to the New Jersey State Parole Board in an effort to help Mr.
> McLendon receive early release.

Mr. McLendon was ultimately not called as a witness at trial. Significantly, defendant's trial counsel was able to elicit most of Mr. McLendon's statement through the testimony of co-defendant Figueras and lead detective Jose Cruz, who both testified at trial. Some of the noteworthy information that was revealed through these witnesses included the fact that co-defendant Figueras informed Mr. McLendon that he had "set the whole thing up," that co-defendant Figueras told Mr. McLendon that he shot one of the victims point blank himself, that co-defendant Figueras stated that the was wearing gloves at the time of the murder which explained why the police did not find gunshot residue on him, and that co-defendant Figueras and co-defendant Hearn were going to avoid liability for the crime as long as they both "kept to their story."

Trial counsel also mentioned Mr. McLendon's statement in both her opening and closing statements. She even explained Mr. McLendon's absence as a witness to the jury during her summation:

> I told you that I would call witnesses, I believe I even mentioned their names, and I didn't. This is why: Everything you need to know to find [petitioner] not guilty of the murders and the robberies you have. There's no need to give you more information when it's repetitive.

> [36T:6-1 to 6-5].

Given all of this information, it is clear that trial counsel's decision not to call Mr. McLendon to the stand was a strategic choice. The fact that trial counsel initially intended to call Mr. McLendon as a witness but ultimately did not, demonstrates that her decision not to call him was not due to a lack of investigation. Rather, it appears that from the evidence in the record that trial counsel's decision not to call Mr. McLendon was due to the fact that trial counsel was able to elicit most of what co-defendant Figueras told Mr. McLendon through the testimony of other witnesses. Importantly, this meant that the jury would be able to hear about the co-defendant Figueras' statements to Mr. McLendon without having the jury learn about Mr. McLendon's lengthy criminal record. Further, by not calling Mr. McLendon to the stand, the jury also would not have learned that Mr. McLendon was attempting to use the information he provided about the case in exchange for a reduced sentence, thereby creating a credibility issue about Mr. McLendon's motives. Thus, there is nothing in this record to establish that trial counsel's decision not to call Mr. McLendon to the stand was anything other than a sound strategic choice. Further, there is no evidence in the record that defendant was prejudiced by not having Mr. McLendon testify at trial. Defendant never alleged any favorable evidence that could only have been elicited from Mr. McLendon's testimony that

was not elicited through the testimony of other witnesses. This court affords high deference to trial counsel's trial strategies.

Accordingly, not only has defendant failed to demonstrate that trial counsel's performance was deficient in any way, but he has also failed to demonstrate that he has suffered from any prejudice as a result. Therefore, defendant does not meet the two- prong *Strickland* test necessary to maintain an ineffective assistance of counsel claim.

(ECF No. 14-43, PCR Decision at 17-21.)

The Superior Court of New Jersey, Appellate Division, affirmed the PCR court's decision:

Defendant's second argument, ineffectiveness of counsel due to failure to call McLendon, was also properly rejected by the PCR judge as reasonable trial strategy. By not calling McLendon at trial, trial counsel avoided McLendon's likely impeachment on the witness stand, given his damaging criminal history. She placed the substance of McLendon's statement into evidence through other witnesses. She provided jurors an explanation for her decision not to call McLendon n her closing. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a claim for PCR based upon ineffective assistance of counsel. *State v. Cooper*, 410 N.J. Super. 43, 57 (App. Div. 2009) (quoting *Strickland*, at 690-91 (1984)).

*Suarez-Perez*, 2021 WL 1327165, at *4.

The Appellate Division did not unreasonably apply *Strickland* in finding that the decision not to call McLendon was a reasonable trial strategy. The record shows that the State provided discovery relating to McLendon pretrial. This discovery included McLendon's formal pretrial statement, correspondence, judgments of conviction, and parole information. (ECF No. 14-41 at Pa1, Pa6, Pa26-31, Pa34-35, Pa40-67, Pa72-74, Pa76.) According to that discovery, McClendon had three prior New Jersey felony convictions.[8]

---

[8] On October 18, 1982, McClendon was sentenced to five years' probation following his convictions for third-degree burglary and theft; on February 17, 1984, McClendon was sentenced to ten years in State prison following his guilty plea to second-degree aggravated sexual assault; and on September 21, 2007, McClendon was sentenced to three years in State prison following his conviction for first- degree armed robbery. (*Id.* at Pa54-60, Pa74.) McClendon was also convicted in 1996 in the United States District Court for the District of New Jersey of bank robbery and

On cross examination, Figueras testified that he told McClendon that he knew how to get some money and drugs by robbing drug dealers; that he knew where drug dealers hung out; that he and petitioner got into the car belonging to the drug dealer; that Wakefield, the driver of the white Lexus, got out of the car and started running; and that petitioner ignored Figueras's warning to wear gloves. (ECF No. 14-15, Trial Tr. at 170:3-174:5.)

Trial counsel also reviewed McLendon's statement with Detective Cruz on cross-examination, which informed the jury of the gist of McLendon's statement. Cruz testified that McLendon told him that Figueras admitted to McLendon the following: Figueras "popped" one of the victims at "point blank" range; Figueras believed that he would get away with the murder because only petitioner tested positive for gunshot powder residue; Figueras wore gloves when he shot the drug dealer and got rid of the gloves after the shooting; and as long as Figueras and Hearn stuck to their story they would be okay. (ECF No. 14-21, Trial Tr. at 125:24-143:13.)

Trial counsel then used Figueras's and Cruz's testimony regarding McLendon's statement in her summation. After noting that "Figueras acknowledged making this statement in his testimony," counsel listed three of Figueras's admissions to McLendon which were corroborated by other evidence presented by the State: 1) the homicide victim was shot in close range in the head or face; 2) Figueras set up the robbery; and 3) Figueras fought with Wakefield, the driver of the Lexus, over the drugs. (Exhibit #24 at 39-11 to 40-6.) Petitioner has never explained what, if any, additional information would have been elicited by calling McLendon to the witness stand, other than to have McLendon repeat in more detail to what he told Detective Cruz. (*See* Exhibit 14-38; Exhibit 14-40 at 27-33; Exhibit 14-45 at 32.)

---

sentenced to 57 months in federal prison. (*Id.* at Pa63-64.) McLendon was also arrested twice in New Jersey in 2009, although these charges were dismissed. (*Id.* at Pa74.)

When § 2254(d) applies, as it does here, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.  On the one hand, "courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions" *Id.* at 109.  On the other hand, Strickland "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* at 110 (citing *Strickland*, 466 U.S., at 688).

As a general rule, trial counsel's strategic decisions become vulnerable to challenge only when they are based on an unreasonably inadequate investigation of the law or facts or lack of consideration of available options.  *Strickland*, 466 U.S. at 690-91.  The decision not to call a particular witness may be deficient only when "the record as it was developed in the state courts disclosed no reason – strategic or otherwise – to support trial counsel's failure to call" that witness. *Branch v. Sweeney*, 758 F.3d 226, 238 (3d Cir. 2014).

That is not the case here.  In her summation, trial counsel told the jury that, even though she planned to call witnesses, she changed her mind and "[t]his is why: Everything you need to know to find [petitioner] not guilty of the murders and the robberies you have. There's no need to give you more information when it's repetitive." (ECF No. 14-21, Trial Tr. at 6:1-6.)  The record plainly shows a strategic reason supporting trial counsel's decision not to call McLendon as a witness.  McLendon's testimony regarding his formal statement to Detective Cruz was unnecessary in light of Figueras' and Cruz's testimony about the substance of McLendon's statement.  Moreover, by eliciting the crux of McLendon's statement to Detective Cruz through the State's witnesses, trial counsel avoided  any attacks on McLendon's credibility.  Because trial

counsel pursued a reasonable trial strategy, the Court finds that the Appellate did not unreasonably apply *Strickland's* performance prong and denies relief on this claim.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right and a certificate of appealability is therefore denied.

## V.    CONCLUSION

For reasons explained in this Opinion, the Court denies the § 2254 habeas petition and also denies a certificate of appealability.  An appropriate Order follows.

_____
ROBERT KIRSCH
United States District Judge


November 1, 2024.